PETTIGREW, J.
|?In this case, plaintiff appeals from the trial court’s judgment denying its requests for injunctive relief and declaratory judgment and dismissing its case with prejudice. For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
On April 19, 2011, plaintiff, Orleans Parish School Board (“OPSB”), filed a petition seeking injunctive and declaratory relief. The Louisiana Department of Education (“DOE”), the Louisiana State Board of Elementary and Secondary Education (“BESE”), and John White, in his capacity as Superintendent of Education, were all named as defendants.[1] On December 20, 2011, and March 13, 2012, OPSB filed two supplemental and amending petitions intended to “correct and/or clarify factual allegations in the original petition.” Ac *1108 cording to the petitions, OPSB alleged that the defendants were exceeding their constitutional authority by retaining control over non-failing OPSB schools that had been transferred from the jurisdiction of the OPSB to the BESE administered Recovery School District (the “RSD”). OPSB sought a judgment declaring that the attempts by the defendants to retain control over non-failing OPSB schools or otherwise interfere with the business affairs of the OPSB exceeded the constitutional and statutory limits of their authority. More specifically, OPSB requested that the trial court issue a permanent injunction [2] restraining the defendants from acting in violation of their constitutional authority.
The matter proceeded to trial on March 16, 2012, at which time the trial court heard arguments and brief testimony. Later that same day, the trial court issued written reasons for judgment, denying the OPSB’s requests for injunctive relief and declaratory judgment. A judgment in accordance with the trial court’s written reasons for judgment |awas signed on April 28, 2012. It is from this judgment that OPSB has appealed, assigning the following specifications of error for our review:
1. The trial court erred in refusing to declare that Louisiana Administrative Code Bulletin 111, Chapter 24, Sections 2403(A) — (C), (E) and (F) are unconstitutional.
2. The trial court erred in refusing to provide permanent injunctive relief requiring the unconditional return of schools to OPSB which are no longer deemed to be failing.
STANDARD OF REVIEW
An injunction shall be issued in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law. La.Code Civ. P. art. 3601(A). The issuance of a permanent injunction takes place only after a trial on the merits, in which the burden of proof must be founded on a preponderance of the evidence. State Machinery & Equipment Sales, Inc. v. Iberville Parish Council, 2005-2240, p. 4 (La.App. 1 Cir. 12/28/06), 952 So.2d 77, 80-81. The standard of review for the issuance of a permanent injunction is the manifest error standard. City of Baton Rouge/ Parish of East Baton Rouge v, 200 Government Street, LEG, 2008-0510, p. 5 (La.App. 1 Cir. 9/23/08), 995 So.2d 32, 36, writ denied, 2008-2554 (La.1/9/09), 998 So.2d 726.
A declaratory judgment is one that simply establishes the rights of the parties or expresses the opinion of the court on a question of law, without ordering anything to be done, and its distinctive characteristic is that the declaration stands by itself with no executory process following as a matter of course, so that it is distinguished from a direct action in that it does not seek execution or performance from the defendant or the opposing litigants. Billingsley v. City of Baton Rouge, 95-2162, p. 4 (La.App. 1 Cir. 4/30/96), 673 So.2d 300, 302, writ denied, 96-1490 (La.9/20/96), 679 So.2d 439. Appellate courts review a district court’s decision to grant or deny a declaratory judgment using the abuse of discretion standard. Mai v. Floyd, 2005-2301, p. 4 (La.App. 1 Cir. 12/6/06), 951 So.2d 244, 245, writ denied, 2007-0581 (La.5/4/07), 956 So.2d 619.
^DISCUSSION
Article VIII, § 3 of the Louisiana Constitution of 1974 provides for the creation *? of BESE and sets forth the limits of BESE’s power. In 2003, Louisiana voters approved an amendment to La. Const. Art. VIII, § 3. The amendment, effective November 6, 2003, authorized BESE to take control of “a public elementary or secondary school which has been determined to be failing.” As amended, Article VIII, § 3(A) authorizes BESE to supervise, manage, and operate failing schools or to provide for their supervision, management, and operation as follows:
(A) Creation; Functions. The State Board of Elementary and Secondary Education is created as a body corporate. It shall supervise and control the public elementary and secondary schools and special schools under its jurisdiction and shall have budgetary responsibility for all funds appropriated or allocated by the state for those schools, all as provided by law. The board shall have other powers, duties, and responsibilities as provided by this constitution or by law, but shall have no control over the business affairs of a city, parish, or other local public school board or the selection or removal of its officers and employees; however, the hoard shall have the power to supervise, manage, and operate or provide for the supervision, management, and operation of a public elementary or secondary school which has been determined to be failing, including the power to receive, control, and expend state funds appropriated and allocated pursuant to Section 13(B) of this Article, any local contribution required by Section 13 of this Article, and any other local revenue available to a school board with responsibility for a school determined to be failing in amounts that are calculated based on the number of students in attendance in such a school, all in the manner provided by and in accordance with law. [Emphasis added.]
In connection with this amendment, the legislature passed several statutes that went into effect upon approval of the amendment. With La. R.S. 17:10.5, the legislature defined a “failed school” as one that had been designated as academically unacceptable under a uniform statewide program of school accountability established by rules adopted by BESE. When a school had been designated as academically unacceptable for four consecutive years, the school would be removed from the jurisdiction of the local school board and transferred to the jurisdiction of the RSD, upon the approval of BESE. La. R.S 17:10.5(A)(1).[3] Such a failed school would then be | ^reorganized, as necessary, and operated by the RSD in such a manner as to bring the school to an acceptable level of performance. La R.S. 17:10.5(B).
With La. R.S. 17:1990(A)(1), the legislature created the RSD, effective November 6, 2003, and authorized it to “provide an appropriate education for children attending any public elementary or secondary school” that had been transferred to the jurisdiction of the RSD pursuant to La. R.S. 17:10.5. To that end, the RSD was granted the authority to “provide for the supervision, management, and operation of a school placed under its jurisdiction ... with all the same power and authority as the prior system from which it was transferred[.]” La. R.S. 17:1990(B)(2)(a).
In 2004, the legislature enacted La. R.S. 17:10.6, which restricted the authority of the local school board to act once the school system was determined to be “academically in crisis.” Pursuant to the statute, “academically in crisis” was defined as *1110 “any local system in which more than thirty schools are academically unacceptable or more than fifty percent of its students attend schools that are academically unacceptable.” La. R.S. 17:10.6(B)(1). When such conditions existed, the statute restricted the local school board’s authority such that it could act only in certain specified situations.
In 2005, the legislature passed Act 35. Act 35 made no changes to La. R.S. 17:10.5 or La. ,R.S. 17:10.6. However, it did enact an entirely new statute, La. R.S. 17:10.7, which, at that time, provided, in pertinent part, as follows:
A. (1) Each elementary or secondary school that participates in a Spring cycle of student testing and has a baseline school performance score below the state average ... that is a school in or granted a charter by a city, parish, or other local public school system that has been declared to be academically in crisis pursuant to R.S. 17:10.6, and that has at least one school eligible to transfer to the Recovery School District pursuant to R.S. 17:10.5, shall be designated a failing school and shall be transferred to the jurisdiction of the Recovery School District established in R.S. 17:1990. The Recovery School District ... shall provide all educational services required of any city, parish, or other local public school system in order to meet the educational needs of all students residing in the jurisdiction of the transferring local school system who were attending a transferred school or who would have been eligible to attend such transferred school because of the residential location of the student or as the result of any other option or program available to the student.
|fiC. (1) The recovery district shall retain jurisdiction over any school transferred to it for a period of not less than five school years not including the school year in which the transfer occurred if the transfer occurred during a school year.
(2)(a) No later than nine months prior to the expiration of the five-year period, the recovery district shall make a report to the state board.
(b) The report shall include at a minimum each of the following elements:
(i) The status of each school transferred, the nature of its faculty and administration, the demographics and size of its student body, its organizational and management structure, whether there has been improvement in student academic performance and, if so, how much and, if not, why not.
(ii) A recommendation as to whether the school should be:
(aa) Continued in the recovery district pursuant to its reported operational status.
(bb) Continued in the recovery district with a change in its operational status and the nature of the recommended change.
(cc) Closed and the reasons therefor.
(dd) Returned to the administration and management of the transferring system with proposed stipulations and conditions for the return.
(3) No later than six months prior to the expiration of the five-year period, the state board shall take action on the recommendations of the recovery district. Any action that results in an affirmative agreement to maintain the school in the recovery district shall retain the school in the recovery district for an additional five-year period, unless a lesser time is adopted by the state board. The report and the action required in this Paragraph shall occur no later than six *? months prior to each period of continuation.
Thus, under La. R.S. 17:10.5, which was in effect prior to Act 35, a school could be transferred to the jurisdiction of the RSD if certain conditions existed, subject to the approval of BESE. Under La. R.S. 17:10.7, as enacted pursuant to Act 35, a school could be transferred immediately and automatically to the jurisdiction of the RSD for a minimum of five school years. La. R.S. 17:10.7(0(1). Near the end of the five-year period, the RSD was required to make a recommendation to BESE as to whether each school within its jurisdiction should be retained within the RSD, closed, or returned to |7the administration and management of the transferring system with proposed stipulations and conditions for its return.[4] La. R.S. 17:10.7(0(2), (3).
Pursuant to the authority conferred upon it by the Louisiana Constitution and by La. R.S. 17:10.5 and La. R.S. 17:10.7, BESE, promulgated regulations to assist in determining the fate of OPSB schools that had been transferred to the RSD’s jurisdiction. Former Superintendent Pastorek devised a framework to govern the statutorily mandated determination by BESE' of whether a school was eligible for transfer out of the RSD’s jurisdiction.
LAs set forth in LAC 28:LXXXIII.2403 (“Bulletin 111”), often referred to as the Pastorek Plan, the guidelines for determining the eligibility for transfer out of the RSD’s jurisdiction are, in pertinent part, as follows:
*1112 A. This policy provides the mechanism for transferring of eligible schools from the jurisdiction of the recover/ school district (RSD) while ensuring that the school’s autonomy and flexibility is retained to allow continued substantial improvement and high standards of accountability. An eligible school may elect to transfer from the RSD and return to its former local educational authority (LEA) or an alternative governing authority (AGA), if authorized by law. If a school chooses not to transfer to its LEA, it will automatically remain within, the RSD for an additional five year period.
B. No school shall be eligible for transfer from the jurisdiction of the recovery school district until the conclusion of the 2011-2012 school year. No school shall be transferred from the RSD without the approval of the Louisiana Board of Elementary and Secondary School (BESE).
C. A non-failing school is eligible for transfer from the jurisdiction of the recovery school district provided it meets all of the following.
1. The school has been under the jurisdiction of the recovery school district for a minimum of five years as either a direct-run RSD school or a Type-5 charter school.
2. The school meets the performance requirement as defined by having established two consecutive years of a school performance score (SPS) that is at least 80 or if the academically unacceptable school (AUS) bar is raised above 75, then at least 5 points above the AUS bar as established by BESE pursuant to the statewide school and district accountability system.
3. The school elects to transfer from the RSD and has notified BESE no later than December 1 of the year preceding the effective date of the proposed transfer.
a. Type 5 Charter School. The charter school’s governing authority, in accordance with its by-laws, shall notify BESE in writing of its desire to transfer from the jurisdiction of the RSD.
b. Direct-Run RSD School. The superintendent of the RSD, in consultation with the parents of students attending the school, and the school’s staff, shall make a recommendation to BESE seeking transfer from the jurisdiction of the RSD.
4. No later than January 1 of the school year preceding the effective date of the proposed transfer, BESE shall make a determination whether or not to transfer the school and the mechanism of such transfer.
5. The former local educational authority or the alternative governing authority (collectively referred to as recipient authority) has agreed to accept jurisdiction of the transferring school.
|96. The following parties must agree to transfer no later than April 1 of the school year preceding the effective date of such transfer:
a. the governing authority of a charter school, if a charter school; or
b. the superintendent of the RSD, if a direct-run RSD school; and
c. BESE; and
d. the recipient authority.
[[Image here]]
E. Type 5 Charter Schools. The transfer of a Type 5 charter school from the RSD shall become effective on July 1 of the year following BESE’s approval of such transfer.
1. The charter school must negotiate a new charter agreement with the recipient authority to become either a Type 3 or Type 4 charter school. A copy of the *? signed negotiated charter agreement must be provided to BESE no later than April 1 preceding the effective date of the proposed transfer. The new charter agreement must:
a. be effective on the date of transfer (July 1);
b. be consistent with all state and federal laws governing charter school authorization; and
c. contain academic performance standards and other requirements for extension and renewal that are equal to or greater than Type 5 charter school performance standards as enumerated in BESE Bulletin 126.
2. Transfer to a Type 3 Charter School. If the charter school elects to become a Type 3 charter school, the non-profit charter organization shall apply to the recipient authority to operate the school. The charter contract agreement must conform to all the laws and requirements governing Type 3 charter schools.
3. Transfer to a Type 4 Charter School. If the charter school elects to become a Type 4 charter school, the recipient authority must apply to BESE to operate the charter school, with the approval from the charter operator. The charter contract agreement must conform to all the laws and requirements governing Type 4 charter schools.
F. Direct-Run RSD Schools. A direct-run RSD school may transfer directly to the recipient authority as a direct-run school, or may transfer as a Type 3 or Type 4 charter school.
1. Transfer to a Charter School. A non-failing direct-run RSD school may elect to transfer to the recipient authority as either a Type 3 or a Type 4 charter school. Such transfer to the recipient authority shall be made in the same manner as described in Paragraph E.l above.
2. Transfer as a Direct-Run School. A direct-run RSD school may elect to become a direct-run school under the recipient authority, in which case the recipient authority shall enter into a memorandum of | ^understanding (MOU) with BESE. The MOU shall be effective for a maximum of three years, and shall provide, at a minimum, the following.
a. Non-Failing Direct-Run RSD Schools
i. Preserve the Existing School Autonomy, The transferring school shall retain its existing level of autonomy over such elements, including but not limited to, its educational program and curricula, its staffing, and its budget decisions.
ii. Continued Performance. The recipient authority shall be required to maintain school performance equal to or greater than that achieved by the RSD. Should the transferring school, become AUS during the term of the MOU, the school shall be immediately returned to the jurisdiction of the RSD.
iii. School Budget. The transferring school shall maintain its school-level budget at a level at least equal to that school-level budget it maintained while in the RSD, adjusted for current enrollment, the MFP and/or federal, local and/or other sources of revenue.
iv. Recourse. Violation of the MOU may result in the school being returned to the RSD.
b. Failing Direct>-Run RSD Schools
i. Turnaround Plan. The MOU shall identify key benchmarks and milestones demonstrating the turnaround strategy being executed and successfully improving student academic outcomes.
*1114 On appeal, OPSB argues that LAC 28:LXXXIII.2403(A)-(C) and (E)-(F) violate the limitation on defendants’ jurisdiction as set forth in La. Const. Art. VIII, § 3. OPSB acknowledges that La. R.S. 17:10.5 provides a mechanism by which schools can be transferred to the RSD and that La. R.S. 17:10.7 “triggered the transfer of 107 ‘failing schools from the OPSB to the RSD during the 2005-2006 school year” and detailed “the mechanism for the return of these schools to OPSB.” OPSB maintains that “La. R.S. 17:10.7 does not, however, provide for the automatic retention of non-failing schools under RSD jurisdiction. Nor does it allow BESE to impose restrictions not contemplated by the Constitution on non-failing schools that opt to leave RSD control.” OPSB alleges that Bulletin 111 does both and, thus, is unconstitutional as it contradicts La. R.S. 17:10.7.
In Louisiana, it is a well-settled principle that statutes are presumed to be constitutional unless fundamental rights, privileges, and immunities are involved. World Trade Center Taxing Dist. v. All Taxpayers, Property Owners, 2005-0374, p. 11 (La.6/29/05), 908 So.2d 623, 632. Moreover, unlike the federal constitution, the | ¶ provisions of our state constitution are not grants of power, but rather are limitations on the otherwise plenary power of the legislature. The legislature may enact any statute that the state constitution does not prohibit. Id.
Accordingly, a party seeking a declaration of unconstitutionality must point to a particular constitutional provision that prohibits the legislature from enacting the statute at issue. It must be shown clearly and convincingly that it was the intent of the constitutional provision to deny the legislature the power to enact the statute in question. When considering a constitutional challenge, the question before the court is whether the constitution limits the legislature, either expressly or impliedly, from enacting that statute in question. World Trade Center Taxing Dist., 2005-0374 at 12, 908 So.2d at 632.
In denying OPSB’s request for permanent injunction and dismissing its request for declaratory judgment, the trial court noted as follows in written reasons .for judgment:
The plaintiffs cite Article VII Section 3 of the Louisiana Constitution which provides for the creation of BESE and sets forth the limits of BESE’s power. OPSB specifically points to the provision stating that BESE was prohibited from exerting any control over or interfering with “the business affairs of a city, parish, or other local public school board ...” Further stating that a 2003 amendment to Louisiana Constitution Article VIII Section 3 gave BESE “the power to supervise, manage and operate or provide for the supervision, management and operation of a public elementary and secondary school which has been deemed to be failing ...”
Louisiana Revised Statute 17:1990 created the RSD and [Louisiana] Revised Statute 17:10.5 provided the mechanism by which schools could be transferred to the RSD. After Hurricane Katrina, Act Number 35 of the First Extraordinary Session of 2005 (Act 35) created Louisiana Revised Statute 17:10.7 which/the plaintiffs aver, allowed the RSD to trigger the wholesale transfer of 107 failing schools from the OPSB to the RSD during the 2005-2006 school year.
Under the aforementioned statutes, the transferred OPSB schools are to remain under the RSD’s control for an initial 5 year Transfer Term. The schools transferred to the RSD in 2004 and 2005 will end their initial Transfer *1115 Term at the conclusion of the 2011-2012 school year and will be subject to one of the following: closure, return to the OPSB or retention by the RSD.
The plaintiffs cite Louisiana Revised Statute 17:10.5 and Louisiana Revised Statute 17:10.7 which they claim dictates that nine months prior to the conclusion of the Transfer Term, the RSD shall submit a report to BESE on each school under its control and issue a recommendation |12regarding the school’s future following the Transfer Term. OPSB further maintains that, according to the statutes, six months prior to the conclusion of the Transfer Term/ BESE shall act upon the RSD’s recommendations and determine which schools will be returned to local control, which schools will be retained by the RSD and which schools shall be closed.
OPSB avers that to assist BESE in determining the fate of the OPSB schools now under RSD control, Mr. Paul Pastorek devised a framework to govern the statutorily mandated determination for BESE (the “Pastorek Plan”) which was adopted in April 2011 and later codified as Administrative Code Bulletin 111, Chapter 24, (Bulletin 111). Under Bulletin 111, according, to the plaintiff, no school is eligible to return to OPSB until the conclusion of the 2011-2012 school year. Also in accordance with Bulletin 111, three types of transferred schools are eligible for returning to the OPSB including, the subject of the instant suit, non-failing OPSB schools. Those schools include: non-failing direct-run RSD schools and non-failing Type 5 Charter Schools.
Non-failing RSD direct-run schools are to be automatically (as stated by the plaintiff) retained under the jurisdiction of the RSD. Only in the event that a non-failing school affirmatively [exercises] an escape option, will these schools be permitted to return to local control through the OPSB. If a school does not affirmatively choose to return to the OPSB control at the end of the Transfer Period, the school will automatically remain with the RSD for an additional five year period.
A non-failing RSD direct-run school may choose to return to the OPSB if the school has been under the jurisdiction of the RSD for a minimum of five years and has had a school performance score (SPS) of at least 80 for two consecutive years. If a non-failing RSD direct-run school affirmatively chooses to return to OPSB control, the school must notify BESE no later than December 1 of the year preceding the effective date of the proposed transfer. BESE is then .charged with determining, by January 1 of the school year preceding the effective date of the transfer, whether or not the school should be'transferred to the OPSB. The superintendent of the RSD, BESE and the OPSB all must agree on the transfer. Additionally, a Memorandum of Understanding (MoU), in accordance with Bulletin 111, must also be executed between BESE and the OPSB which shall include numerous terms and conditions which OPSB avers would prevent the OPSB from having full managerial control over an MoU governed school,
Under Bulletin 111, a non-failing Type 5 Charter School may choose to return to OPSB. However, should a non-failing charter school choose to exit the jurisdiction, of the RSD, it will be permitted to do so after complying with additional requirements including negotiating a new charter agreement with the OPSB.
OPSB asserts here today that by attempting to retain jurisdiction over non-failing OPSB schools, Bulletin 111, Chapter 24, Sections, 2430(A), (B) and *1116 (C) are in violation of Article VIII Section 3 of the Louisiana Constitution, which limits BESE’s direct managerial control to failing schools only. The plaintiff further maintains that by imposing additional restrictions and conditions upon the transfer of non-failing schools back to the OPSB, Bulletin 111, Chapter 24, Sections (E) and (F) violate Article VII Section 3 of the Louisiana Constitution by impermissibly | ^interfering with the business affairs of a local school board. Additionally, the OPSB maintains that Bulletin 111 violates Act 35 of the First Extraordinary Session of 2005.
The defendants argue, and this Court finds, that once a school has been determined to be failing and is transferred to the RSD it is no longer a part of the OPSB. The schools must remain in the RSD for a period of five years. The defendants further maintain and the Court hereby finds that Article VIII, Section 3 of the Louisiana Constitution must be examined in conjunction with Louisiana Revised Statutes 17:10.5 and 17:10.7 because they clarify Article VIII, Section 3.
In Eiche v. Louisiana Board of Elementary and Secondary Education, et al., 582 So.2d 186 (La.1991) citing State ex rel. Guste v. Board of Commissioners, 456 So.2d 605 (La.1984) and Barnett v. Develie [Develle], 289 So.2d 129 (La.1974), the Louisiana Supreme Court stated, “... we must consider the nature of BESE’s role within the overall constitutional framework of education. We begin from the proposition that constitutional provisions, no less than other laws, should be construed so as to give effect to the purpose indicated by a fair interpretation of the language used, and in the event of a conflict or inconsistency, provisions should be construed, if possible, to allow each provision to stand and be given effect.”
In that same case, the Louisiana Supreme Court further stated, “Article VIII Section 1 of the Louisiana Constitution provides that ‘the legislature shall provide for the education of the people of the state and shall establish and maintain a public educational system.’ Article VIII, Section 3(A) creates BESE. The second sentence of this section provides BESE, ‘shall supervise and control the public elementary and secondary schools ... as provided by law.’ In Aguillard v. Treen, 440 So.2d 704, 708 (La.1983), and Board of Elementary and Secondary Education v. Nix, 347 So.2d 147 (La.1977), we explained the phrase ‘as provided by law’ indicated BESE’s powers of supervision and control were not unfettered nor self-executing, but arose from, and were subject to, laws passed by the legislature. Article VIII Section 10 recognizes the existence of parish and city school boards ‘subject to control and supervision by the State Board of Elementary and Secondary Education and the power of the legislature to enact laws affecting them.’ Taken as a whole, these sections make the local school boards subject to BESE’s powers to exercise supervision and control over the public schools, which in turn are pursuant to laws passed by the legislature.”
Under the relevant aforementioned statutes, BESE is afforded the task and charged with the responsibility of taking the reports from the RSD and determining in accordance with the statutes whether the school(s) shall be transferred back to the OPSB or remain in the RSD.
There is no provision that has been shown to this Court today, which prohib *? its the legislature from passing [La. R.S.] 17:10.5 and 17:10.7 regarding the return of RSD schools nor prohibits BESE from promulgating the regulations in Bulletin 111. The Court reiterates, the legislature has the power to pass any legislation not prohibited by the 1 ^constitution. The Court hereby finds that Louisiana Constitution Article VIII, Section B pursuant to the aforementioned amendment, has given BESE the authority over the RSD and the legislature has set forth the criteria via statutes pursuant to which a failing school be transferred to the jurisdiction of the [RSD] and the actions that BESE and the RSD shall take after a school has completed a five year Transfer Term. Bulletin 111, of which Section 2403(A)-(C) and (E)-(F) are at issue here today, is the manner in which BESE promulgated a system by which an eligible school could return back to the jurisdiction of OPSB (or any other school board from which they came). The Court finds that BESE enacted the Pastorek Plan as a means by which to accomplish the task they were charged with — facilitating the transfer of schools from the RSD back to the jurisdiction from which they came.
The OPSB has not shown this court by dear and convincing evidence that Louisiana Administrative Code, Title 28.LXXXIII. Bulletin 111, Section 2403(A)-(C) and (E)-(F) are unconstitutional and the plaintiffs request for permanent injunction is hereby denied. Accordingly, the plaintiffs petition for declaratory judgment is hereby dismissed. All costs of this proceeding shall be paid by the OPSB.
The record before us reasonably supports a finding that OPSB failed in its burden of proving that Bulletin 111 was unconstitutional. It is well settled that laws on the same subject matter must be interpreted in reference to each other. La. Civ.Code art. 13. Thus, La. Const. Art. VIII, § 3 must be read along with La. R.S. 17:10.5, La. R.S. 17:10.7, and Bulletin 111. There is nothing in the language of Article VIII, § 3 that “clearly and convincingly” shows that it was the intent of the constitutional provision to deny the legislature the power to enact the pertinent provisions of La. RS. 17:10.5 and La. R.S. 17:10.7 and for BESE, in turn, to enact the regulations found in Bulletin 111 governing the return of RSD schools to the jurisdiction of local school boards such as OPSB. The pertinent statutory language of La. R.S. 17:10.5 and La. R.S. 17:10.7 is virtually identical. Once a school has been determined to be “failing,” it is transferred to the RSD and must remain there for a period of at least five years. La. R.S. 17:10.5(0(1) and La. R.S. 17:10.7(0(1). Pursuant to these same statutory provisions, near the end of the five-year period, the RSD is required to make recommendation to BESE as to whether each school within its jurisdiction should be retained within the RSD, retained within the RSD with a change in its operational status, closed, or returned to the administration and management of the transferring system with proposed | ^stipulations and conditions for its return. La. R.S. 17:10.5(0(2) and La. R.S. 17:10.7(0(2).
Contrary to OPSB’s arguments on appeal, these statutes, along with the guidelines set forth in Bulletin 111, allow the defendants to not only retain jurisdiction over schools that may no longer be considered “failing,” but also to impose conditions upon schools that may be returned to the jurisdiction of the' transferring system. As 'correctly noted by deféndants in briéf to this court:
La. R.S. 17:10.5 and La. R.S. 17:10.7 show the legislative intent to allow for formerly failing schools to remain within the RSD beyond the time that their school performance scores rise above the failing level. These statutes also *1118 clearly confer upon BESE the discretion to determine when, and under what conditions and stipulations, an RSD school is to be returned to the jurisdiction of a local school board. It is BESE that is tasked with the responsibility of reviewing the RSD’s recommendation and making a decision regarding the status of each RSD school after the initial five years under the jurisdiction of the RSD.
Following a thorough review of the record before us and the applicable law, we agree with the trial court’s judgment. The conclusion by the trial court that OPSB failed In its burden of proving that Bulletin 111 was unconstitutional is reasonably supported by the record. Based on the foregoing, we find no error or abuse of discretion in the trial court’s judgment, OPSB’s assignments of error are without merit. Thus, we affirm the trial court’s judgment denying OPSB’s request for in-junctive relief, denying OPSB’s request for a declaration that Bulletin 111 is unconstitutional, and dismissing, with prejudice, OPSB’s case.
CONCLUSION
For the above and foregoing reasons, the trial court’s April 23, 2012 judgment is affirmed. All costs associated with this appeal in the amount of $1,337.50 are assessed against Orleans Parish School Board.
AFFIRMED.

. We note that at the time OPSB filed its original petition, Paul G. Pastorek was the acting Superintendent of Education and named as a defendant in this matter. However, in a first supplemental and amending petition filed on December 20, 2011, Mr. White was named as the current Superintendent of Education and the proper party defendant.

. At the start of the trial, the parties stipulated that it was, in fact, a request for a permanent injunction as counsel for OPSB indicated, "We have dismissed our request for preliminary injunction.”

. The statute further provided for the transfer to the RSD of failed schools for which the local school board had failed to present or implement an acceptable reconstitution plan.

. In 2008, the legislature amended La. R.S. 17:10.5 so that its provisions regarding the return of RSD schools to local school boards more closely tracked the language found in La. R.S. 17:10.7. See La. R.S. 17:10.5(0, as amended by 2008 La. Acts, No, 489, § 1, effective August 15, 2008. Louisiana Revised Statutes 17:10.7 was also amended by 2008 La. Acts, No. 737, § 1. Pertinent to our discussion here are the changes made to La. R.S. 17:10.7(0(1) as follows:
C. (1) The recovery district shall retain jurisdiction over any school transferred to it for a period of not less than five school years not including the school year in which the transfer occurred if the transfer occurred during a school year. At the end of the initial transfer period, the school may be returned to the system from which it was transferred unless the school is continued in the recovery district in accordance with the provisions of Paragraph (3) of this Subsection.
(2)(a) No later than nine months prior to the expiration of the initial or subsequent transfer period, the recovery district shall make a report to the state board.
(b) The report shall include at a minimum each of the following elements:
(i) The status of each school transferred, the nature of its faculty and administration, the demographics and size of its student body, its organizational and management structure, whether there has been improvement in student academic performance and, if so, how much and, if not, why not. (ii) A recommendation as to whether the school should be:
(aa) Continued in the recovery district pursuant to its reported operational status.
(bb) Continued in the recovery district with a change in its operational status and the nature of the recommended change.
(cc) Closed and the reasons therefor.
(dd) Returned to the administration and management of the transferring system with proposed stipulations and conditions for the return.
(3) No later than six months prior to the expiration of the initial or subsequent transfer period, the state board shall take action on the recommendations of the recovery district. Additionally, no later than six months prior to the expiration of the initial or subsequent transfer period, the state board shall conduct a public hearing within the jurisdiction of the city, parish, or other local public school board from which the school was transferred relative to whether the school should be continued in the recovery district or returned to the system. The state board by a majority vote of its membership may continue any school in the recovery district for additional periods of five years. [Emphasis denotes changes from original.]